The next case this morning is 522-0526, People v. Craig. Arguing for the defendant appellant is Pamela Rubio. Arguing for the state appellee is Jennifer Camden. Each side will have 10 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Morning, counsel. Good morning. Ms. Rubio, are you ready to proceed today? I am. Then go right ahead. Morning, your honors. May it please the court. On appeal, Antoine Craig raised three issues. This morning, I'd like to focus most of my time on the erroneous submission of the cell phone and location data. But if time permits, I'd like to touch on the court's refusal to bifurcate the guilt phase from the sentencing phase of Antoine's trial. In an effort to place Antoine at Tanisha Jenkins' home at around the alleged time of her death, the state introduced into evidence self-authenticating business records from T-Mobile and Google and the testimony about those documents of Detective Tim Beckett. The state concedes on appeal that these documents were entered into evidence erroneously because the proffered certifications accompanying those records were not in compliance with Illinois Rule of Evidence 90211 because they did not state that they were made under oath subject to the penalty of perjury. Since that important language was omitted from the certifications, those business records, which were admitted through a hearsay exception, were not self-authenticating and the state did not present any live testimony to lay the necessary foundation for the admission of these documents. Because of the state's concession, the only question before this court is whether the state can prove that the error was harmless beyond a reasonable doubt, and here they cannot. These documents played a critical role in the state's case against Antoine. Through those documents, Detective Beckett provided an exhaustive accounting of Antoine's whereabouts on the night in question and the following morning and afternoon. He then detailed numerous calls and texts exchanged between Antoine and Tanisha, including angry and threatening texts. This was the only evidence presented by the state to show that Antoine was at Tanisha's home at or around the time of her death, and the state relied heavily on this information in its closing, mentioning that location, data, and text, and cell phone information at least nine times during closing. Specifically, the state explicitly argued, how do we know that he was there and did the killing? His phone puts him there, the GPS puts him at her house during those exact times. So the state cannot meet its burden of proving beyond a reasonable doubt that this evidence did not contribute to Antoine's between the last time her friend saw him at 2 a.m. and when he was seen at her house at around noon the next day. That's a 10-hour gap in the state's timeline. This case is similar to the case of People v. Ramos, the first district case for 2018. Their T-Mobile historical cell site location data was introduced through officer's testimony similar to this case, and that dictated the exact location of that defendant's SUV. None of those records were certified, similar to what happened here, and there the appellate court held that the admission of that testimony and the documents was not harmless because it filled, quote, an important gap in the detective's testimony because no other evidence actually put the defendant inside the SUV during the time of armed robbery in question in that case. The court went on to say that the hearsay enabled the jury to make an inferential leap and conclude that he was in the SUV, and the court noted that this is the type of highly persuasive evidence for a jury because it's imbued with the presumption of scientific certitude. The same conclusions can be reached in this case. Without the evidence in question, the state's case left a huge 10-hour gap in its story at its most critical point in the timeline, Tanisha's death, and this evidence is what allowed the state to definitively argue that there was no one else there, but in fact, before her death and after she left the bar, Tanisha actually received a call from one other person, called a second person twice, and called a third person named Bonk at 2.50 a.m., very close to her alleged time of death, and there was also someone else's DNA on the broom handle that the state claimed Antoine used to clean up Tanisha's house, and unlike in Ramos, here we have no eyewitness testimony, so there's no testimony or actual information about Tanisha's time of death, so this data provided new non-cumulative evidence that was pivotal to the state's case, and this court should conclude that the introduction of this evidence was not proven to be harmless beyond a reasonable doubt. As for the bifurcation issue, this court should also remand for a new trial because the trial court committed reversible error when it denied Antoine's request to bifurcate the guilt phase from the sentencing phase of his case. In response to Apprendi, the Illinois legislature enacted a statutory requirement that the state plead improve sentencing enhancement factors, and the Illinois Supreme Court amended Rule 451 to allow for bifurcation of the guilt and sentencing phases of a defendant's trial facing the enhancement factors. Rule 451g states when the state intends to rely on those sentencing factors, the court in its discretion could conduct a unitary trial or upon motion of a party, which was filed in this case, conduct a bifurcated trial, and in deciding whether to conduct a bifurcated trial, the court must first hold a pretrial hearing to determine both if proof of the sentencing enhancement factor is not relevant to the question of guilt or if undue influence outweighs the both answers to those questions lead to the conclusion that the court should have bifurcated in this case. First, the enhancement factor was not relevant to the question of Antoine's guilt because the cause of death was unquestionably undisputed to be the smothering of Tanisha. The other injuries that Tanisha incurred were all took place prior to her death, so they were not necessary to prove guilt. They were only relevant to whether the murder was accompanied by brutal or heinous behavior. And second, the undue prejudice of the introduction of the brutal and heinous evidence during the guilt phase of Antoine's trial outweighed any probative value the factor had. By refusing to bifurcate, the court allowed the state to detail every injury to the jury through testimony, gruesome photos, gruesome videos, and highlight the fact that the Tanisha was still alive when she incurred all of the other injuries other than the smothering. And the state took advantage of the court's ruling and closing argument, making a laundry list of the various acts and injuries that occurred before Tanisha's death, describing them in a gruesome manner, calling the crime unimaginable, telling the jury that Tanisha was a victim, and this evidence had to have had an undue effect on the jury when deciding Antoine's guilt alone. But here, the court didn't even consider what kind of undue prejudice this evidence would have had on Antoine, but only worried about the burden bifurcation would place on the state, which was not only contrary to the language and purpose of 451G, but erroneous. The hands would be tied because they would have a difficult time parsing out the evidence. But honestly, it would have been easy for them to argue guilt to the jury without detailing the preceding injuries in such a dramatic fashion as they did. And then, if guilt had been found, then go on to argue brutal and heinous. It was Antoine's hands that were actually tied because his ability, his attorney's ability to zealously represent him was severely limited by the court's ruling. She explained on the record that she had no option but to concede brutal and heinous to preserve any credibility when arguing Antoine's innocence. And she explained that it was impossible to tell the jury this was just a, quote, regular murder without conceding his guilt. And in fact, she explained that Antoine would have waived a jury for the brutal and heinous factor, but because of the court's ruling on bifurcation, he was never given that opportunity. So instead, counsel had to concede the brutal and heinous in order to defend Antoine's innocence, which is why she started her closing by admitting that what happened to Tanisha was horrific, horrible, and awful. Antoine was in the awkward and unfair position of having to deny that he committed a crime, yet offer proof about how he committed it. So for these reasons, this court should reverse Antoine's conviction and remand for a new trial. Thank you, Ms. Rubio. Before we move on to Ms. Camden, Justice Vaughn or Justice Barberis, do you have any questions at this time? I do not. No. All right. Thank you. And obviously, you'll be given your time for rebuttal. Thank you. Ms. Camden, go right ahead. Thank you, Your Honor. May it please the court, counsel, Jennifer Camden on behalf of the people. A note at the outset, I was not the author of the state's answer brief, but I've read the record and I'm ready to present the state's arguments. And like counsel, I'll begin with issue two, the business records issue. Now the state's brief argues that admission of the records was harmless error because other properly admitted evidence overwhelmingly supported the conviction. And I'd like to discuss the scope of that other properly admitted evidence. The state conceded that business records may have been admitted in error. And from the T-Mobile business records, we learned that the contact listed in Tanisha's phone as Antoine was the defendant Antoine Craig. But we did not learn from those records her call history with her Antoine contact or the content of the text she received from her Antoine contact. The police got that T-Mobile records. The jury learned that on the night of the murder, Tanisha took a picture of her boyfriend, the defendant, posing in the clothes he wore to the bar with her that night. She texted that picture of the defendant to her phone's Antoine contact at 1035 p.m. The icon associated with her Antoine contact was a picture of a couple embracing. After she left the bar at around 2 a.m., the defendant approached Tanisha in the parking lot and they argued. He grabbed her wig off her head and threw it. That's on video surveillance from near the bar. Her friend Naoshi said that he loudly called Tanisha names and acted enraged. Naoshi drove Tanisha home alone and testified that Tanisha was upset about the defendant. Tanisha's Antoine contact then called her three times between 311 and 325 a.m. and she didn't pick up. During the same time frame, her Antoine contact repeatedly texted her sexual insults and threats such as, quote, you did, ho. All of that was probative that the defendant Antoine Craig was the person who then broke into her home and murdered her, and none of that came from the T-Mobile data. Similarly, from the Google business records, we learned the precise times that the defendant was near various locations, including two different liquor stores, the bar, and Tanisha's home. But there was video and testimonial evidence that he was present at all of those places, including at Tanisha's home. Now, the defendant argues that only the business records placed him at Tanisha's home at the time of the murder, but the precise time of death wasn't actually in evidence. We only know that she was cold when police got to her just before noon. So, evidence as to the precise times that he was at her home was not critical to the state's theory of the case. So, even without the Google data, the jury learned that the next morning Tanisha's on her well-being and saw the defendant inside amid the broken items and mess that was instantly apparent upon entering. Her testimonies corroborated because after she quickly left and called 911, an officer arrived and also saw the defendant inside the home, as shown on his body cam video of a person emerging from inside the home wearing the same distinctive shirt that Sabrina Jones stated that the defendant was wearing when she picked him up his subsequent trip to the liquor store are also shown on video. And he appears to be wearing the same shirt shown in the body cam video. Now, the defendant argues that this only shows that he was at Tanisha's home after she was killed, but defendant testified, or sorry, defendant told Naochi that the, that Tanisha was sleeping. And that shows that he knew her condition and was lying to protect himself. He hadn't just happened upon the scene. The house was an obvious wreck and he must've been there a while as shown by the damp and bloody washcloths in the home and other signs that he had tried to clean up. Also the defendant fled the victim's home when he saw the officer showing consciousness of guilt. Again, he hadn't just happened upon the scene. Now the defendant, the reply brief at page nine attempts to minimize the physical evidence by saying that it could be explained because they were dating, but the car that yielded the DNA evidence wasn't as the defendant states. It was the car of Sabrina Jones who gave him a ride just after he fled from police and the DNA found in it belonged to Tanisha. And it got there because Tanisha's blood was on the defendant's clothes and shoes when he fled from her home. And the defense fingerprint wasn't just in her home. It was his fingerprint in her blood. And it was on the cover of a notebook that was found amid the bloody debris on the floor of the room where she was murdered. So that shows that the defendant was present at the time of the struggle and after the victim had begun bleeding. Also the defendant made incriminating statements in Sabrina's car to explain the blood on his clothes immediately after he fled from Tanisha's home that he quote, got into it with her that quote, I cracked her. And he went on to say that she fell back onto a stand and blood was everywhere that matched the crime scene. The victim had been cracked. She'd sustained repeated blunt head trauma causing a subdural hemorrhaging concussion. Furniture was broken and her blood was all over the house. So the defendant accurately described what happened during the murder which was powerful evidence of guilt. Also a police officer testified that the bloody footprints in Tanisha's hall looked like they were left by Air Force One tennis shoes. When Sabrina picked the defendant up the next morning near the scene of the murder, he was wearing Air Force Ones with dark stains on them. There's video of those stains from the liquor store video and they hadn't been there the night before, which we know from the video surveillance of him leaving the bar at 1 49 AM wearing bright white, clean tennis shoes. If there are no questions from the court on that issue, I'll move to issue one regarding bifurcation. A note at the outset is that the state's brief at page four through seven argues that the trial court did not have the authority to bifurcate the trial and the defendant's reply brief correctly observes that rule 451 G gives the court that authority. So I want to make clear that the parties agree that on that point that the court had the discretion to bifurcate the trial, but as the state went on to argue in its brief, the court did not abuse its discretion in denying the defense motion to bifurcate. Now because her cause of death was Tanisha's extensive non-fatal injuries to be kept from the jury at trial, that's why he filed a motion to bifurcate and an accompanying motion to bar the evidence of the non-fatal injuries from admission in the guilt phase. But the victim's non-fatal injuries were highly relevant and probative of the defendant's intent to kill her or do great bodily harm to her or his knowledge that his acts create the strong probability of the same. That intent or knowledge was of course elements of the charges of murder. Without evidence of Tanisha's non-fatal injuries, the evidence that the defendant then covered her nose and mouth and smothered her to death would be out of its fair and relevant context and the state would have had to show the defendant's intent or knowledge as to that act of smothering artificially and unreasonably divorced from the evidence that first he repeatedly beat her head until she bled and she got a subdural hemorrhage, repeatedly sliced her face open probably with a broken bottle and set her head on fire in her own bed. Also as the trial court noted, the state's theory was that this was not a random attack, the defendant was the victim's boyfriend. Also he'd already verbally and physically attacked her that night as shown from video and testimonial evidence. So the brutality of the attack was of identity. As a practical matter, this evidence was inseparable. The victim was smothered to death but there was blood all over her body and house. The trial court wasn't required to bifurcate the trial to create an artificial wall between the evidence of her smothering and the evidence of how her blood got there. For example, a particularly probative piece of evidence of the guilt was the defendant's fingerprint in her blood on that notebook. The state could not have explained the relevance and probative value of that evidence without proof that she was beaten and cut before she was smothered to death because that's where the blood came from. In addition to being relevant, the evidence of the non-fatal injury was was carefully limited by both the court and the state and any prejudice from its admission in a unitary trial was not undue. I'd note that prior to trial the court barred admission or publication of some images of non-fatal injuries at trial during the display of the photos of the crime scene and the autopsy. The state made a record that it was quickly showing certain images, quickly taking them off the screen. The state did not made a record that it did not show pictures of the victim's face during opening statement or closing argument. And finally, I'd note that the court withheld some pictures of the crime scene in the autopsy even from the jury during deliberations, even among those pictures that had been admitted. The defendant argues that the court's reasoning was in error, but of course that reasoning is irrelevant. This court can affirm for any reason apparent from the record. And here the court explicitly considered whether the proof of wanton cruelty was relevant to the issue of guilt and concluded that it was. That complied with rule 451g and because of that, it was because of that the court noted that bifurcation would result in difficulty for the state, but the court's ruling was not an abuse of discretion for these reasons and the reasons in the people's answer brief. So I'd respectfully request that this court affirm. Thank you. Excuse me. Thank you, Ms. Camden. Before we let Ms. Camden go, Justice Vaughn or Justice Barberis, do you have any questions? No questions. No. All right. Thank you. Ms. Rubio, go right ahead with your rebuttal. Sure. Thank you. I just have a few points to make. Counsel argues that the error in admitting the cell phone location data is harmless because the other evidence overwhelmingly proves Antoine's guilt. But it must be remembered that the question is whether Antoine murdered Tanisha Jenkins and that 10-hour time gap in the story is pivotal to that question. So the evidence relating to, you know, he doesn't dispute, he never disputed that he was with Tanisha at the bar that an argument had occurred. The question at play is really that time frame where she's murdered. And again, like I said earlier, the only evidence placing him there during that 10-hour window is the inadmissible cell phone and location data. So whether or not Niyoshi was able to testify about a photograph that was sent at 2 a.m. is really not helpful to the analysis here. As to the other circumstantial evidence, we don't dispute, we don't need to argue on appeal that Antoine was not proven guilty beyond a reasonable doubt in order to request a reversal and remand on this prejudicial evidentiary error. We have to show that the state actually has to show that the evidence was not harmless beyond a reasonable doubt. And some of the ways that courts in the past have done the harmless error analysis in these contexts is to decide whether the evidence contributed to the conviction, whether the other evidence overwhelmingly supports a conviction, or whether the evidence was cumulative, the improper evidence. And here, even if this court finds that some of the other circumstantial evidence was strong, again, there's still a gap in the most important part of the time frame. So I do believe that the other evidence did not overwhelmingly support the conclusion that Antoine was the actual murderer, but it just goes to show that he was circumstantially there beforehand, he admitted he had gotten into a fight with her beforehand, and he was seen 10 hours later in her home. ≫ Okay. Let me ask you a question. With regard to the argument that Ms. Camden made in that the T-Mobile records were not necessarily needed to get to the evidence on the phone calls and texts because her friend provided the code to get into the phone, is it, one, how do you address that? Two, I know in the brief there's a mention of the fact that he made many, many calls and texts to her up to the point of her presumed time of death after that. There was never another call. Very indicative of him knowing that she's not going to answer because I just killed her or somebody did. How do you address those two things? ≫ Well, the first question, my take on this is that Niyoshi can only testify to her personal knowledge. So if she knew about the content of those texts, she could testify to that. But otherwise, I mean, the contents of those texts and the missed phone calls, that did come in through the inadmissible T-Mobile records. ≫ I was under the impression that she provided the police officer with the code so that the officer could get in and physically on his own look through the phone records on her phone. ≫ That I don't recall. But the state introduced all of that information through a pretrial motion as they needed to file to enter it under 902.11. So that's how it came in and that's how it was challenged. ≫ I am, I think that even if the officer was allowed to testify to what he saw on the phone after he unlocked it, the rest of the data was very damaging in that it aligned the time frame with the phone calls. ≫ In regard to what T-Mobile provided, if he were able to, if the officer were able to testify as to what was on the phone, times, content, so forth and so on, is it anything from T-Mobile cumulative? ≫ I think that there was a lot of additional information that T-Mobile provided. And especially the location data. ≫ I thought the location data was Google. ≫ Right, that was Google. I don't really, I don't believe that it was cumulative. I think that it was prejudicial because the records show like the court has found, these types of records are highly influential to a jury. It has a certain aspect of scientific certainty. A police officer would not be able to testify to any kind of certainty to the reliability or accuracy of any of this. The T-Mobile records were supposed to certify that this information was authentic and real and not tampered with in any way and that's the whole basis of this rule in order to prevent. ≫ If the officer were testifying about what he observed, what he was able to recover from the phone himself, then defense counsel would have had the opportunity to cross examine him on that as to whether his rendition was accurate. Not necessarily requiring or relying on T-Mobile's verification of that. Isn't that the case? ≫ Yes, but I guess I would just say that the T-Mobile records would show that there was, you know, before he opened, you know, to make sure that the officer didn't tamper with the evidence or anything, delete any text messages or go into the phone, delete text messages from the T-Mobile records. ≫ There was never any accusations or any suggestion that any of that occurred, though? ≫ No, no. But there were. ≫ I don't mean to beat a dead horse on this. I was just curious. I know your time is up. I would ask presiding justice Booey to give you an opportunity to close up your argument here since I asked a bunch of questions after your time had expired. ≫ I have no problem with that and obviously would let Ms. Rubio finish her argument after being peppered by Justice Barberis there. ≫ Thank you. Like I said, I do think that the additional evidence was highly prejudicial, even if the officer could have testified to the content of some of the text messages. And, you know, even if we say that possibly the T-Mobile information might have been cumulative, there's no way the other information about Antoine's location could have been admitted properly or was admitted properly in this case. And that alone prejudiced the defendant because it placed him exactly at the exact time as the state argued in closing. That was the proof that they relied on in placing him at the scene of the crime. And the fact that he was there later doesn't prove that he was the actual murderer. It just proves that he was there sometime after her death. As to the bifurcation issue, counsel argues that this information was important to show knowledge of the probability of great bodily harm or death. But the state did not need to evidence conclusively that the victim was smothered to death. And so a smothering would definitely rise the level of proving that if somebody is smothered, you intend to kill or do great bodily harm to them. The other injuries that the state used to argue the victim was damaging details about the situation. And that wasn't necessary for finding him guilty of the murder. And as for which evidence would have been admissible during the guilt phase versus the sentencing phase, if the trial court had done a proper analysis, the parties could have discussed this. If bifurcation had been granted, they could have gone through each piece of evidence and said, you know, evidence about the altercation prior to the murder at the bar was admissible, the video would have been admissible, certain photos would have been admissible, but the other gruesome, gory details should have been reserved for the sentencing phase. So if this court has no further questions, we just ask that the court reverse Antoine's conviction and remand for a new trial. I know Justice Barberis, like I said, had a few questions. I just have one last one and it kind of goes actually to what you and Ms. Camden were talking about. In a trial, especially one such as this, you know, the trial court has to look at, you know, giving both parties, the state and the defense, allowing them to put a, you know, their case on to be fair to both parties. And would you not agree that in some cases, you know, some evidence may come in because if it were to be barred, then there might be holes that the state can't explain in their case in chief and the court has to weigh all these things in making these rulings on what to let in, what not to let in, to allow the story to flow, so to speak, to make sure the cases in chief get done properly? Well, yes, and that is already part of the consideration of 451g. The comments of that rule state that the default is a unified trial, a unitary trial, because of the burden that the state would have in having to parse it out. But nonetheless, the court still has to go through the analysis of whether the enhancement factor was relevant to the question of guilt and whether undue prejudice would outweigh probative value. So there is built into the rule the concession that there might be some probative value and that there might be some burden placed on the state by having to bifurcate it. But this rule acknowledges that in cases like Antoine's, where the other injuries were not the cause of death, that that evidence is so damaging to the question of guilt that it should be reserved and parsed out. And like I said before, he would have waived a jury on brutal and heinous if he had the opportunity, as defense counsel stated on the record. But he wasn't even allowed to do that here. So those factors are already built into the rule and it still will say that the court should bifurcate if undue prejudice outweighs the factors probative value. The only case that I could find that dealt with a bifurcation issue was a second district case from 2020. And it was a post-conviction case, so it didn't really affect anything. But in that case in Walsh, they said that their bifurcation wouldn't have been necessary in that case. But in that case, the murder was a shooting. And there was no other evidence of a preceding torturous situation or anything like the case we have here. We could easily parse out in this case the preceding injuries from the smothering. So for that reason, I think that the court was wrong in not granting bifurcation. Well, thank you, Ms. Rubio. Before we let counsel go, Justice Vaughn or Justice Barberis, any last questions? Just to follow up on the bifurcation issue, the Norwood case is referenced. And in that case, the first district found that it was not error to deny a motion to bifurcate. You cite an Arizona case and a Guam case where they say it should have been bifurcated. Are you aware of any Illinois cases where it was error not to bifurcate? Not that I could find, no. Thank you. Thank you, Justice Barberis. A couple of things before we let counsel go. First of all, I commend both of you. You did very well today. Those oral arguments were excellent and very helpful, at least to me, in this particular case. Kudos to you all, especially you, Ms. Camden, coming in late in the game. You both did an outstanding job today, I will tell you that.